UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DONALD MURPHY,

Plaintiff,

DECISION AND ORDER

00-CV-6038L

v.

BOARD OF EDUCATION OF THE ROCHESTER CITY SCHOOL DISTRICT, et al.,

Defendants.

**INTRODUCTION**

On July 10, 2003, this Court granted summary judgment in favor of all defendants in this civil rights action against the Rochester City School District ("District"), the Rochester Teachers Association ("RTA"), and a number of individual defendants. In my summary judgment decision, 273 F. Supp.2d 292 (W.D.N.Y. 2003) (familiarity with which is assumed), I noted that the RTA had moved for attorney's fees, but I deferred deciding the motions until the appellate process had concluded. *Id.* at 327 n. 30. That has now occurred. On July 28, 2004, the Court of Appeals for the Second Circuit affirmed my summary judgment decision dismissing the complaint, "substantially for the reasons given by the district court." 106 Fed.Appx. 746, 747.

Both defendants, as prevailing parties, now move for an award of attorney's fees against plaintiff, Donald Murphy ("Murphy"), under the fee-shifting provisions of 42 U.S.C. §§ 1988, 2000e-5(k), and 12205. The District seeks $562,322 in fees; the RTA seeks $416,273.[1]

This is–presumably–the last chapter in litigation between Murphy and defendants that was commenced over a decade ago. As noted in my summary judgment decision, 273 F. Supp.2d at 297, the case has grown from a simple employment dispute over one teacher's interschool transfer, into a gargantuan, broad-based campaign against an entire school system. Much of the blame for that can be laid at plaintiff's feet, for he, acting through his then-attorney, chose to use this action as a vehicle to launch a "virtual crusade" against defendants, *id.*, in which every injustice, insult, or inconvenience, real or imagined, that Murphy believed he had suffered in his employment was alleged to be a violation of plaintiff's civil rights. It is because of that misuse of the judicial process that I grant, in part, defendants' motions for attorney's fees. Plaintiff, Donald Murphy, is hereby ordered to pay defendants a total of $270,000 for attorney's fees.

## DISCUSSION

### I. Attorney's Fees to Prevailing Defendants: General Standards

Awarding fees to a prevailing defendant is not mandatory; the relevant statutes provide that such an award *may* be made within the discretion of the court. See 42 U.S.C. § 1988(b) ("In

[1]Because the individual defendants are all associated with either the District or the RTA, references to the District or the RTA will be understood to encompass the relevant individual defendants as well.

any [civil rights action under] ... this title, ... the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs"); 42 U.S.C. § 2000e-5(k) ("In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee ... as part of the costs"); 42 U.S.C. § 12205 ("In any action ... commenced pursuant to this chapter, the court ..., in its discretion, may allow the prevailing party ... a reasonable attorney's fee, including litigation expenses, and costs").

In exercising that discretion, the Court is cognizant that the fee-shifting statutes serve a different purpose depending on whether plaintiff or defendant happens to be the prevailing party. Awards to prevailing plaintiffs are more common, both because a successful civil rights plaintiff has vindicated an important federal policy, and, conversely, because the defendant in such a case has violated federal law. *See LeBlanc-Sternberg v. Fletcher*, 143 F.3d 765, 769 (2d Cir. 1988) (explaining rationale behind policy of "routinely" awarding fees to prevailing plaintiffs in civil rights actions).

Although attorney's fees "are not so readily available to a prevailing defendant," *id.*, such awards nevertheless serve an important purpose by serving as a deterrent to litigants who bring, or are contemplating bringing, frivolous lawsuits. Because of that deterrent effect, they also shield defendants from having to endure the burden and cost of defending against such frivolous litigation. *See Andrade v. Jamestown Housing Auth.*, 82 F.3d 1179, 1193 (1st Cir. 1996) (noting that an award of attorney's fees to a prevailing defendant must be substantial enough to "fulfill the deterrent purpose of § 1988 and 42 U.S.C. § 2000e-5(k) in discouraging plaintiffs from bringing frivolous claims"); *Tancredi v. Metropolitan Life Ins. Co.*, No. 00Civ.5780, 2003 WL

22299203, at *6 (S.D.N.Y. Oct. 7, 2003) ("Fees are awarded to prevailing defendants in civil rights cases principally to deter frivolous litigation") (citing *Carrion v. Yeshiva Univ.*, 535 F.2d 722, 727 (2d Cir. 1976)).

In general, therefore, an award of attorney's fees in favor of a prevailing defendant is appropriate "only when the plaintiff's 'claim was frivolous, unreasonable, or groundless, or the plaintiff continued to litigate after it clearly became so.'" *Parker v. Sony Pictures Entertainment, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978)). "Application of this standard is entrusted to the discretion of the district court ... ." *Parker*, 260 F.3d at 111.

The import of *Christiansburg* and its progeny is that "reasonable attorneys' fees should be awarded to a prevailing defendant in a Title VII action found to have been unreasonable, vexatious or groundless unless there exist affirmative reasons for not doing so." *Prate v. Freedman,* 583 F.2d 42, 46 (2d Cir. 1978). Although a showing a bad faith on the part of plaintiff is not a prerequisite to a fee award, *see American Fed'n of State, County and Mun. Employees, AFL-CIO (AFSCME) v. County of Nassau*, 96 F.3d 644, 650 (2d Cir. 1996), if bad faith *is* present, "there will be an even stronger basis" for awarding fees to the defendant. *Christiansburg,* 434 U.S. at 422; *accord Davidson v. Keenan,* 740 F.2d 129, 133 (2d Cir. 1984).

**II. Application to this Case**

Applying those standards here, I think it is fair to say that if ever there were a case in which fees should be awarded to a prevailing defendant, this is it. From its inception, this case

was meritless and without foundation. I also find that plaintiff continued to litigate the case not only up to the granting of summary judgment, but afterwards, when the groundless nature of the claims had become readily apparent. Furthermore, I find that plaintiff brought and pursued this litigation in bad faith, for the improper purpose of attacking the District and school administrators about matters that had nothing to do with the original basis for this lawsuit, *i.e.*, plaintiff's transfer from one school to another without loss of pay or benefits.[2]

In my summary judgment decision, I carefully considered what the Court of Appeals described as plaintiff's "cavalcade of claims," in an effort to find "traces" of evidence to support the numerous claims. 106 Fed.Appx. at 747. I found no such evidence. I need not repeat here everything that I wrote in my 35-page summary judgment decision, but a recitation of some of my comments in that decision about the weakness of plaintiff's case will indicate the groundless nature of plaintiff's claims.

---

[2]Murphy's case is one of several brought at about the same time, against the same District and school administrators by the same attorney. I granted summary judgment in favor of the defendants in all of the cases. *See Seils v. Rochester City Sch. Dist.*, 192 F.Supp.2d 100 (W.D.N.Y. 2002); *Bliss v. Rochester City School Dist.*, 196 F.Supp.2d 314 (W.D.N.Y. 2002) (dismissing three consolidated cases).

In each of the companion cases, the Court of Appeals, in affirming my grant of summary judgment, stated: "This appeal is frivolous and it appears that this action has been frivolous from beginning to end. Accordingly, our mandate does not preclude imposition of Rule 11 sanctions, including attorneys' fees, in the district court upon motion by any defendant or by the court *sua sponte*." *Coons v. Board of Educ. of Rochester City School Dist.*, 100 Fed.Appx. 854, 855 (2d Cir. 2004); *Seils v. Rochester City School Dist.*, 99 Fed.Appx. 350, 352 (2d Cir. 2004); *Bliss v. Rochester City School Dist.*, 103 Fed.Appx. 421, 422 (2d Cir. 2004); *Eaton v. Rochester City School Dist.*, 100 Fed.Appx. 855, 855 (2d Cir. 2004).

Although the Court of Appeals' statements concerning those cases do not in themselves provide a basis for awarding attorney's fees in this action, based on my familiarity with all these cases, I believe that Murphy's action was at least as frivolous as the others.

I stated, for example, that: "Plaintiff has failed utterly to meet that burden [of showing that the District's reasons were pretextual]," 273 F.Supp.2d at 302; "That plaintiff could even make such an argument [concerning statistics] is little short of astonishing," *id.* at 303; "[Murphy's] claim also fails for the simple reason that he has not presented evidence that would support a finding that he suffered any adverse employment action," *id.*; "plaintiff has failed to present any evidence, aside from his own personal preferences, showing that any of his transfers or reassignments could be considered adverse," *id.* at 304; "While plaintiff spends considerable time discussing why he believes he should have been given certain jobs, notably absent from his papers is why his race, age, sex, etc., were in any way connected with these events," *id.* at 309; "There is not a shred of evidence that plaintiff's race, age or sex played any part in the decision to suspend him," *id.*; "plaintiff has completely failed to make out a hostile work environment claim under these standards," *id.* at 312; "First, as with most of plaintiff's claims, the Court's analysis of this issue is hampered by plaintiff's broad, generalized allegations. Just as he has failed to identify any particular protected activity as the basis for his retaliation claim, plaintiff does not single out any particular alleged adverse action as retaliatory," *id.* at 322; "Exactly what plaintiff *is* alleging with respect to the RTA is difficult to discern. As with most of his discrimination claims, plaintiff simply lumps the RTA in with the District and the individual defendants and alleges that they all somehow discriminated against him," *id.* at 323; and "In fact, although this could fairly be said about many aspects of plaintiff's claims, it is difficult at times to understand why the claims against the RTA are even present in this action," *id.* at 324.

My summary judgment decision, then, sets forth more than sufficient reason to award a reasonable fee to defendants for having to defend an action of this type. As my comments in that decision indicate, this case was as meritless as they come. That it took so long to resolve was attributable not to the closeness of the questions presented, but to plaintiff's willingness to make so many reckless allegations of discrimination without a shred of evidence to support them. Such claims, which turn in large part on the defendants' state of mind, are "easy to allege and hard to disprove," *Goad v. Mitchell*, 297 F.3d 497, 502 (6th Cir. 2002) (discussing claims involving government officials' state of mind), and therefore often require substantial discovery and litigation, even when they are groundless from the outset.

This is not, then, a matter of punishing a plaintiff for unsuccessfully pursuing a colorable claim, *see Christiansburg*, 434 U.S. at 421-22 (warning against the use of "hindsight logic" that "because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation"). Plaintiff took a run-of-the-mill dispute with his employer and not only transformed it into an alleged violation of his constitutional rights–which it was not–but deliberately inflated it into a massive, multi-front legal offensive against the District and the RTA. He did so in large part by means of *ad hominem* attacks on the individual defendants, by alleging unlawful discrimination of virtually every type (sex, race, national origin, age, and disability), and by injecting into the case allegations that had nothing whatsoever to do with any legitimate issues in the case.[3] In so doing, plaintiff forced defendants to spend thousands of hours, and over one

---

[3]For example, in his papers opposing defendants' summary judgment motions, Murphy attempted to assert a claim under the Free Exercise and Establishment Clauses of the First Amendment, based in part on the District's participation in a joint program with Roberts

(continued...)

million dollars, defending against claims which, for all their multiplicity, were utterly lacking in substance. It is precisely in these kinds of circumstances that fees should be awarded to prevailing defendants.

Plaintiff attempts to avoid an award by claiming he acted on the advice of counsel. The law is well established, however, that reliance on the advice of one's attorney is no defense to a motion for attorney's fees, because it is the *litigant* that is ultimately responsible for the filing and prosecution of the action. *See Davidson v. Keenan*, 740 F.2d 129, 133 (2d Cir. 1984) ("The proper test for [an attorney's fee award to a defendant] is whether the claim itself is clearly meritless ... . [I]f a claim is groundless, the mere fact that the plaintiff relies on his attorney's erroneous contrary advice does not relieve him of liability"); *see also Baker v. Alderman*, 158 F.3d 516, 527 (11th Cir. 1998) ("In deciding whether to assess attorney's fees against a Title VII plaintiff, a court should not consider the plaintiff's counsel's role in filing or maintenance of a frivolous, groundless, or unreasonable claim, or the plaintiff's apparent lack of personal fault"). The reason for this rule is that "[i]n our legal system, an attorney is his client's agent and representative; the client retains ultimate authority over the conduct of litigation. The party bears the ultimate responsibility for imposition of fees and it will error to enter such an award against the losing party's attorney." *Prate*, 583 F.2d at 48; *accord Corneveaux v. CUNA Mutual Ins. Group,* 76 F.3d 1498, 1508-09 (10th Cir. 1996).

---

[3](...continued)
Wesleyan College ("Roberts"), a sectarian institution, in which students from Roberts would teach at District schools while studying for a master's degree in education at Roberts. As I noted in my summary judgment decision, those claims, while meritless in any event, "[we]re not pleaded in the complaint, and they are utterly unrelated to the claims that *[we]re* pleaded." 273 F.Supp.2d at 326.

Furthermore, Murphy was hardly a naïve bystander in this case. As exemplified by his continual battles with his superiors and others at school, plaintiff was not one to shy away from confrontation, or to sit back passively and uninquisitively while his case wound its way through the judicial system. Murphy was actively involved in this litigation, and he and his counsel were equal offenders. Plaintiff frequently appeared in court to observe oral argument on the various motions that were filed in this case, so he certainly was aware of the types of issues that were being litigated. Murphy also signed numerous affidavits that were filed in connection with those motions and other matters, many of which contained the kind of baseless, irrelevant and improper allegations that justify the awarding of attorney's fees to defendants. *See Murphy*, 273 F.Supp.2d at 312 (noting that plaintiff's affidavit contained "a series of allegations that range from the merely silly ... to the scurrilous and arguably defamatory"). Presumably, plaintiff read those affidavits before signing them, and well understood the nature of the claims and allegations they contained.

Plaintiff's general obstructionist attitude is further evidenced by his vague, non-responsive and obviously misleading answers at his post-judgment deposition concerning his finances. On November 17, 2005, for example, when he was shown a certain handwritten document, plaintiff was asked if the note was in his handwriting, to which he responded, "It is my wife's handwriting. You can't read my handwriting." Dkt. #432 Ex. A at 23. On November 30, however, plaintiff insisted that he could not tell whether certain entries on a check register had been made by him or his wife, because his and his wife's handwriting "are pretty close." *Id.* at 179. Plaintiff repeated several times that he could not tell whether other handwritten

notations had been made by him or his wife. *See id.* at 180,183, 195-98, 202-07, 218. He added that his "wife can't tell [the difference] either." *Id.* at 228.[4]

Some of plaintiff's antics during his employment were also, to say the least, extreme and seemingly calculated to do little more than annoy school officials or to call attention to himself. For example, as I noted in my summary judgment decision, 273 F.Supp.2d at 318-19, Murphy–who continually insisted that the ventilation at the school where he taught was inadequate for an asthma sufferer like him, despite the failure of extensive efforts to identify any airborne contaminants–arrived to teach at the school one day wearing a full, head-to-toe hazmat-type suit. On another occasion, several students reported to the vice principal of Murphy's school that Murphy had shoved one of his sixth-grade female students. When questioned about it, "Murphy immediately (and conveniently) complained of difficulty breathing and left the building." 273 F.Supp.2d at 310. He remained on sick leave for the rest of the school year at full pay, and never returned to that school.

Further supporting an award of attorney's fees to defendants in this case is plaintiff's continuing to litigate the case after it became obvious that the case was meritless. *See Parker*, 260 F.3d at 111. My summary judgment decision could not have spelled out in any clearer terms

---

[4]After plaintiff had testified several times that he could not tell whether he or his wife had made certain entries, counsel for the District asked plaintiff to write his name and the date on a blank piece of paper. Murphy initially said that he "could try" but that he was "under medication for arthritis" and "d[id]n't write very well at th[at] exact time." Dkt. #432 Ex. A at 225. After some discussion between counsel, Murphy said that he would only write with his "left hand because my right hand is virtually useless today which means you probably won't be able to read it." *Id.* at 226. Murphy also stated that any checkbook entries that he had made were written with his right hand, and that he "do[es]n't write anything with [his] left hand." *Id.* at 226-27. After some further discussion, Murphy's attorney stated, "We are not going to do it," *i.e.*, provide a handwriting sample. *Id.* at 229.

how baseless this case was.[5] Unfazed, plaintiff authorized his attorney to appeal that decision. When the Court of Appeals affirmed "substantially for the reasons given by the district court," 106 Fed.Appx. at 747, plaintiff did not take that as a sign that perhaps it was time (indeed, well past time) to end this litigation, but sought a writ of *certiorari* from the United States Supreme Court, which was denied. 125 S.Ct. 1640 (2005).

On remand from the Second Circuit, plaintiff, through his attorney, promptly filed his own motion for sanctions against defense counsel (Dkt. #388), as well as a "Motion for Recusal, Discovery and Due Process Rights" (Dkt. #398), asking me to recuse myself from continuing to preside over this case, as well as an array of other relief. As explained below, those motions, like plaintiff's substantive claims, are meritless, but they further indicate the diehard approach that plaintiff has taken throughout this litigation.

That some award must be made in this case, then, is a given. In determining the amount of the award, though, the Court must balance several factors.

I have no reason to question the hours spent on the litigation or the rates charged by defense counsel. The hours spent were certainly reasonable and necessitated by plaintiff's

[5]In an earlier decision granting summary judgment for the District in three other consolidated discrimination cases filed by the same attorney, I stated that "[i]n these and other cases (*see also ... Murphy v. RCSD*, 00-CV-6038 ...), the prolix complaints set forth numerous vague, often incoherent, causes of action on behalf of current and former RCSD teachers." *Bliss v. Rochester City School Dist.*, 196 F.Supp.2d 314, 317 (W.D.N.Y. 2002). I also noted the "glaring procedural defects and lack of evidentiary support for the claims" in all those cases. *Id.* Although Murphy may not have read that decision, it would be surprising, given the facts that the same plaintiffs' attorney was involved, that Murphy himself submitted affidavits in support of plaintiffs' claims in those three actions, *see id.* at 330, and that Murphy relied on the deposition testimony of Bliss (who worked at the same school as plaintiff) in his own case, *see* 273 F.Supp.2d at 322, if he was not at least aware that I had granted summary judgment for the defendants in those cases.

misplaced, unreasonable litigation and his and his attorney's take-no-prisoners mentality. The rates charged are also consistent with prevailing rates in this area, and defendants have submitted affidavits from other lawyers of similar backgrounds and experience as to the reasonableness of the fees sought. Although plaintiff opposes any award of fees, he does not raise any challenge to defendants' computation of the lodestar figure, which is presumed to be reasonable in any event. *See Farbotko v. Clinton County of New York*, 433 F.3d 204, 208 (2d Cir. 2005) (noting "the presumption of reasonableness that attaches to the lodestar"); *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999) ("there is ... a strong presumption that the lodestar figure represents a reasonable fee").

A plaintiff's financial condition is a factor the Court should consider in determining whether to impose an award and, if so, how much. *See Miller v. Los Angeles Co. Bd. of Educ.,* 827 F.2d 617, 621 (9th Cir. 1987); *Nesmith v. Mariettta Aerospace,* 833 F.2d 1489, 1491 (11th Cir. 1987); *Patton v. County of Kings,* 857 F.2d 1379, 1382 (9th Cir. 1988); *Arnold v. Burger King Corp.*, 719 F.2d 63, 68 (4th Cir. 1983), *cert. denied*, 469 U.S. 826 (1984).

A plaintiff's penurious circumstances alone, however, do not justify declining to make any award at all. The purpose of the fee-shifting statute is to provide deterrence. Therefore, "[a] fee must be assessed which will serve the deterrent purpose of the statute, and no fee will provide no deterrence." *Kreager v. Solomon and Flanigan,* 775 F.2d 1541, 1544 (11th Cir. 1985).

I recognize that to award defendants all that they seek, over one million dollars, would likely ruin plaintiff financially. I am sensitive to the practicalities of imposing a very large award on plaintiff, but it is also important to remember that the amount of the fees incurred by

defendants was plaintiff's own doing. His filing and prosecution of this frivolous lawsuit caused the fees to be as high as they are. He must recognize that there are consequences to such improper actions.

Plaintiff did submit to a post-judgment deposition concerning his finances, and defendants have provided substantial information about his salary, assets, etc., in their submissions on the motions. Clearly, Murphy is not impoverished. He owns several parcels of real property, and is a 49-year-old tenured teacher with the Rochester City School District who now makes $73,875 a year. According to the proposed salary schedule, it is expected that his salary will increase over 4% per year, so that in the School Year 2008-2009, his salary should be about $83,500.

Murphy's wife is also employed and earns approximately $60,000 annually. Their joint income clearly covers all of their rather modest expenses. Although I realize that Murphy's wife was not a party to this action, her income is certainly a relevant factor in considering Murphy's ability to satisfy an award of fees, particularly since Murphy testified that he and his wife have a joint checking account, and that they share their monthly expenses, which are paid out out of that account. Dkt. #432 Ex. A at 85. Murphy does have some discretionary spending, including maintenance of a summer cottage and sending his daughter not to the District where he teaches, but to a private school.

In addition, plaintiff has been making monthly payments to both his trial attorney, Ms. Emmelyn Logan-Baldwin (who withdrew as his attorney in August 2005), and a previous attorney. Although Murphy paid Ms. Logan-Baldwin over $60,000 over the course of the past

four years, he apparently has no intention of voluntarily making any further payments to her. He stated at his deposition that he had not made any payments to her for several months, and when asked if he intended to make any additional payments to her, Murphy replied, "If I have to. If I can afford to. Whatever." Dkt. #432 Ex. A. at 138.

In an affidavit submitted in opposition to defendants' bills of costs (Dkt. #432-10), Murphy outlined his and his wife's average monthly expenses of about $8560. According to Murphy, those expenses comprise $1190 in rent or mortgage, including property taxes, $732 for food, $390 for utlilities, and $6249 in "other expenses," which are not itemized. Dkt. #432-10 ¶ 13. At his deposition, plaintiff stated that those "other expenses" consisted of "[l]awyers' bills, gas, whatever ... . Just day-to-day expenses ... ." Dkt. #432 Ex. A at 74.

That Murphy (who, according to his own testimony appears to live a generally frugal lifestyle)[6] could not better account for $6249 in monthly expenses–a figure that represents nearly three-quarters of his total monthly expenses, and comes out to about $205 per *day*–is little short of astonishing. In addition, although Murphy did, at other points in his deposition testimony, identify some other expenses (some of them discretionary, such as satellite television and lottery tickets), even after figuring in all those expenses, it still appears that Murphy has thousands of dollars per month available to him to satisfy an attorney's fee award.[7]

---

[6]For instance, Murphy states that he and his wife own three vehicles, the newest of which is a 1990 Oldsmobile, worth a total of $3000. Dkt. #432-10 ¶ 12.

[7]The RTA estimates that even after subtracting the purely discretionary expenses that Murphy identified, he has $6000 per month available to him to pay an attorney's fee award. Dkt. #432-16 at 3. Even if that figure is somewhat high (although it does appear to be supported by the evidence), it is clear that Murphy does have more than enough income at his disposal to satisfy the award imposed here.

In light of the above, I award defendants, as prevailing parties, attorney's fees in the sum of $270,000, consisting of $135,000 each to the District and the RTA. It is evident that Murphy is unable to pay this sum in a lump sum, but on the evidence before me he is certainly capable of meeting this obligation on an installment basis.

The Court believes that an award of this size is necessary in this case to provide adequate deterrence of frivolous lawsuits, but to assure that the award will not work an unwarranted, extreme hardship on Murphy the Court will permit him to pay this award in monthly installments of $1,500 per month: $750 to the District and $750 to the RTA. *See Foley v. Bethlehem Steel Corp.*, 30 F.Supp.2d 366, 368-69 (W.D.N.Y. 1998); *Kee v. NEC Technologies, Inc.*, 949 F.Supp. 662, 665 (E.D. Ill. 1997); *Phelps v. Buchele*, No. 84-4371,1992 WL 190708, at *1-2 (D.Kan. July 6, 1992).

**III. Other Pending Motions**

On August 18, 2005, a settlement agreement was filed in this case between defendants and Emmelyn Logan-Baldwin, Murphy's prior attorney. By its terms, that agreement was intended "to resolve each and every pending motion by any of the parties for attorneys' fees and sanctions," except for any motions by or against Murphy.[8] Dkt. #422 at 4. Accordingly, all such motions, other than those directly involving Murphy, are denied as moot.

---

[8]All but one of the plaintiffs in the other related cases against the District, *see* n. 2, *supra*, were also parties to the settlement agreement, which resolved all the pending motions brought by or against those plaintiffs. The only plaintiff besides Murphy who was not a party to that agreement is Pamela Eaton. The pending motions in Eaton's case, 01-CV-6176, will be addressed in a separate Decision and Order.

Murphy also filed a motion on August 4, 2003, for an extension of time to respond to defendants' bill of costs. Although it appears that this motion was never formally granted, Murphy did subsequently file objections to defendants' bill of costs, so that motion is also denied as moot.

While still represented by Logan-Baldwin, Murphy also filed a "Motion for Recusal, Discovery and Due Process Rights" (Dkt. #398). On January 26, 2005, in open court, I denied that motion insofar as it sought my recusal.

As for the other requests for relief contained in that motion, Murphy is now represented by new counsel, and he has never given any indication that he intends to pursue those aspects of the motion. In any event, the motion is denied. There has been some discovery relating to defendants' motions, mostly with respect to Murphy's financial condition, and he has not demonstrated the need for any additional discovery or other unspecified "due process rights."

Again, it is not clear if Murphy, through his new counsel, wishes to pursue his motion for Rule 11 sanctions against defense counsel, but that motion is denied. The basis for that motion is that defendants' own motions for sanctions and attorney's fees were defective in a number of respects. The motion, which was filed while Murphy was still represented by Logan-Baldwin, appears to be little more than a counterattack prompted by tactical considerations. There was more than ample basis for defendants to seek attorney's fees, and the issues relating to defendants' motions for sanctions against Logan-Baldwin have been mooted by the August 18 settlement agreement.

## CONCLUSION

Defendants' motions for attorney's fees (Dkt. #314 and #371) are granted, and the motion for attorney's fees and sanctions filed by the Rochester Teachers Association (Dkt. #378) is granted in part and denied in part. Plaintiff is hereby ordered to pay defendants $270,000, payable in monthly installments of $750 to Harter, Secrest & Emery LLP, as counsel for the Rochester City School District defendants, and $750 to the Rochester Teachers Association. In all other respects, the motion for attorney's fees and sanctions filed by the Rochester Teachers Association (Dkt. #378) is denied as moot.

Defendants' motions for Rule 11 sanctions (Dkt. #316, #365, #383, and #403) are denied as moot.

Plaintiff's motion for an extension of time (Dkt. #320) is denied as moot.

Plaintiff's motion for Rule 11 sanctions (Dkt. #388) and his motion for recusal, discovery and due process rights (Dkt. #398) are denied.

IT IS SO ORDERED.

DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
March 10, 2006